Laramore, Judge,
delivered the opinion of the court:
The plaintiffs, through this congressional reference case[1] (S.B.. 327, 86th Cong., 2d Sess., 1960), seek to recover from the United States the sum of $172,361.40, representing the net cost to the State of Oregon and its instrumentalities of suppressing a forest fire in 1951. This fire, which is commonly referred to as the Vincent Creek fire, originated on defendant’s lands and consumed approximately 28,000 acres of forest lands, of which approximately 11,000 acres were owned by defendant. Plaintiffs base their claim upon the *310 allegation that defendant’s forest practices in regard to the felling of snags [2] and the disposal of slash,[3] being less stringent than those required by the State of Oregon, created an unusual fire hazard and caused the Vincent Creek fire to get out of hand. Defendant not only disputes this allegation 'but also asserts that under plaintiffs’ contractual obligation with defendant they negligently failed to immediately and adequately suppress the fire.
The facts have been found by a commissioner of this court. Plaintiffs have taken many exceptions, even to the extent of challenging not only the wisdom but the integrity of the commissioner by subtle suggestion that the commissioner was formerly solicitor for one of the Federal agencies involved in this case. This court has the utmost confidence in said commissioner, has reviewed his work for many years, and can find no reason to doubt either his ability to find facts or his ability to raise himself above any past association. We have carefully examined the record in the light of plaintiffs’ exceptions and, as a consequence thereof, adopt the commissioner’s report relative to the facts in this case.
The facts are summarized as follows: The Oregon Forest Fire Association is a nonprofit corporation composed of all the forest protective associations operating within the official fire protection districts of the State of Oregon.
At all times material to this controversy, the Oregon Forest Fire Association (acting for itself and its constituent district associations) had a contract with the State of Oregon (acting through the State Forester) under which the district associations were obligated to provide, within their respective areas, fire protection for forest lands owned by the State of Oregon or by private persons who were not members of the various district associations.[4]
*311 The defendant is a very extensive owner of forest lands situated within the State of Oregon. Such lands are, in large part, revested Oregon and California Eailroad and recon-veyed Coos Bay Wagon Koad grant lands, which are commonly referred to as “O & C lands.” The O & C lands are generally intermingled with privately owned forest lands and grazing lands, so as to constitute a “checkerboard” pattern of land ownership.
The O & C lands are administered by the Bureau of Land Management, an agency of the defendant, under the supervision of the Secretary of the Interior and subject to the provisions of the Act of August 28, 1937 (50 Stat. 874), as amended and supplemented by the Act of June. 24, 1954 (68 Stat. 270).[5] The governing legislation provides (with exceptions that are not material to this litigation) that the O & C lands shall be managed for permanent forest production and the disposition of timber in conformity with the principle of sustained yield.
Section 5 of the Act of August 28, 1937 (50 Stat. at 875), states as follows:
Sec. 5. The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect. The Secretary of the Interior is further authorized, in formulating forest-practice rules and regulations, to consult with the Oregon State Board of Forestry, representatives of timber owners and operators on or contiguous to said revested and reconveyed lands, and other persons or agencies interested in the use of such lands.
In formulating regulations for the protection of such timberlands against fire, the Secretary is authorized, in his discretion, to consult and advise with Federal, State, and county agencies engaged in forest-fire-protection work, and to make agreements with such agencies for the cooperative administration of fire regulations therein: Provided, That rules and regulations for the protection of the revested land from fire shall conform *312 with the requirements and practices of the State of Oregon insofar as the same are consistent with the interests of the United States.[6] (Emphasis supplied)
For a number of years prior to the fire in controversy, the defendant, acting through the Bureau of Land Management (hereinafter referred to as BLM), engaged the Oregon Forest Fire Association to provide fire protection to defendant’s lands. The contract originally required the Oregon Forest Fire Association, through its constituent district associations, to
* * * protect the forest values on all of the foregoing classes of lands, * * * and * * * [to] guard such lands from fire with the same degree of care as is "given all other lands within the said protective units.
BLM did not think its lands were afforded proper protection under the above-quoted clause, since it was the policy of the association not to take charge of a forest fire in the absence of a request of the person owning or conducting operations on the land where the fire originated. This resulted in undue delays in controlling forest fires. The dissatisfaction with the clause and the delays was communicated to the association. A new clause was inserted in the July 1, 1950 contract, at the insistence of the BLM, whereby the association’s members would be under a protective obligation to protect BLM lands upon the discovery of a forest fire. The clause provided:
3. Irrespective of actions by others to suppress fires occurring on or threatening O&O lands covered by this agreement, within their respective protective areas the associations will supervise control action on any such fire as soon after its discovery as it is possible to get supervisory personnel to each such fire and will immediately take such steps as are necessary to assure its suppression in the least possible time.
By contract dated July 1,1950, the Western Lane Forest Protective Association agreed to carry out all the obligations of the Oregon Forest Fire Association, under the above contract, as to BLM land within its protection boundaries.
*313 On August 16,1951, a contractor for E. K. Wood Lumber Company, while constructing a logging road in a section of BLM land covered by the fire protection contract, negligently ignited a forest fire. The E. K. Wood Lumber Company did not have permission to construct such a road at that time.
The fire, later to be known as the Vincent Creek fire, was spotted by a fire lookout at about 3:55 p.m. on August 16, 1951, and was reported to Eay Oglesby, the District Fire Warden for the area member of the Oregon Forest Fire Association, the Western Lane Forest Protective Association. Oglesby contacted a Jack Wood, the District Association’s Fire Warden at the Vincent Creek Guard Station, and had him take his crew of four teenage boys to the fire to check on it and report back. Oglesby also alerted his main 10- or 12-man fire suppression crew of the probability of their dispatch to the fire, but did not send them to fight it on that day.
J ack Wood and his crew arrived at the fire about 4:30 p.m. Wood walked around the fire, found that the fire was burning on both sides of the road under construction, and that it had caught in a “snag”. The fire then covered approximately four to five acres and was spreading; however, the rate of spread was slow. Wood reported these things to Oglesby and requested authority to hire a caterpillar tractor and men to assist him in controlling the fire. Oglesby told him to take what action seemed appropriate. Wood and his small crew then endeavored to start a tractor standing nearby for use in controlling the fire. They found this impossible as the tractor was not operational. Wood and his crew then attempted to control the fire by building, with hand tools, a fire trail on the uphill side of the fire. Arrangements were also made with the Whitlow Lumber Company for the latter to furnish a caterpillar tractor and some personnel to assist in controlling the fire.
At about 7:00 p.m. Oglesby, the District Fire Warden for the Western Lane Forest Protective Association, reached the scene of the fire. At that time, three hours after the fire had been reported, only J ack Wood and his crew of four boys were fighting it. Oglesby met the logging supervisor of the E. K. Wood Lumber Company, who advised Oglesby that he was *314 leaving to round up some men to fight the fire. Oglesby believed it was the obligation of the E. K. Wood Lumber Company to control the fire, and to provide men and resources to do so. Oglesby spent the remainder of August 16 waiting for this fire crew from the E. K. Wood Lumber Company which never arrived that day. Although it appears at this juncture that the E. If. Wood Lumber Company was not only negligent in starting the fire, but also was negligent in its failure to adequately fight the spreading fire, such negligent misfeasance cannot absolve plaintiffs of their contractual obligation with defendant to provide adequate fire protection to defendant’s lands, since we cannot impute the negligence of this independent contractor to defendant. See Restatement, Torts, § 318, Comment a (1934); Prosser, Law of Torts, §75 (1955 Ed.).
By 7:30 p.m. the fire had spread to where it covered about 60 acres. At 8:30 p.m., only Jack Wood, his crew of four boys, two tractors, and about five men were attempting to suppress the fire. At 9:00 p.m., Wood and his four boys left, and only the few men and the two tractors were left to fight the fire. By midnight on August 16,1951, the Vincent Creek fire had spread to the point where it covered about 160 acres.
On August 17, at about 4:00 a.m., a special crew of 25 firefighters, maintained by the State of Oregon, reached the fire and worked thereon until 9:00 a.m. of that day. On arriving at the fire they began to cut a fire trail on the east side of the fire. However, this attempt to contain the fire was not successful, since the fire broke through their line at a number of places. They discontinued their efforts at 9:00 a.m. Early in the morning of the 17th, a crew from the E. K. Wood Lumber Company finally arrived on the scene and began fighting the fire. The Longbell Lumber Company, the major lumber operator in the area, also furnished some men and equipment that day. However, in the morning and afternoon of August 17,1951, the fighting of the fire was on a comparatively small scale. The few crews that were fighting the fire were doing so on a unit-'by-unit basis, without any centralized supervision or direction. There was no effort made to organize a large-scale effort to control the fire. The Western Lane District Warden, Oglesby, in spite of the contract with the *315 United States requiring tbe Association to immediately take steps to suppress and to supervise tbe control of any fires threatening U.S. lands without regard to the action of others, still believed it was the responsibility of the E. 3L Wood Lumber Company to control the fire. As a result, District Warden Oglesby did not, up to this time, take action to supervise the control of the fire, or take such action as to assure its suppression in the least possible time.
During the morning and afternoon of August 17, the fire had continued to spread. In the middle of the afternoon, the fire had increased to such an extent and generated so much heat that it developed its own drafts and “blew up,” coming out of its original area with great velocity and spreading rapidly. The fire was then completely out of control.
After the fire had been burning for over a day, and after it was completely out of control, a meeting was held wherein the Western Lane Forest Protective Association finally agreed to take over the task of trying to control the fire. Oglesby asked that as a formal predicate to this action the association get a request for assistance from the E. K. Wood Lumber Company. Such a request was obtained, and the Association, through District Warden Oglesby, took over supervision of control of the fire.
Thereafter, a headquarters was set up to fight the fire; firefighting personnel and equipment were recruited, and an overall supervision and control of the fire-fighting activities took place. Due to the extensive resources of fire-fighting men and equipment in the area, personnel and equipment were recruited without difficulty, and eventually a force of 1,500 men was engaged as firefighters.
By the time these organized efforts had started, the fire had grown to such an extent that the fire could not be brought under control despite these concerted activities. It continued to spread for 11 days, until August 28, by which time it had covered some 28,000 acres, including some 11,000 acres of BLM land. At that time the fire had reached its outermost limits of spread, but continued to bum inside its perimeter. Mopping-up operations continued into September of 1951.
*316 The cost of suppressing the fire after it had blown out of control is claimed to be $469,101.89. The E. K. Wood Lumber Company was originally sued for this total amount by the State of Oregon, as having caused the fire. This suit was compromised for $235,000. In addition, a claim against the Longbell Lumber Company was compromised for $50,000. The plaintiffs in this action seek from defendant the difference between these sums recovered and the costs of suppressing the fire, or $172,361.40.
Pursuant to their contractual obligations for the period July 1,1947 to June 30,1952, the defendant paid the Oregon Forest Fire Association the amount of $925,608.56 to provide protection and fire fighting on its forest lands. In each of the last three years the payments were greater than the contribution here sought. Costs incurred by the Oregon Forest Fire Association in one fiscal year were ordinarily spread to the next fiscal year by assessment against the forest lands within the district. However, in this case, no action was taken to spread the costs of the suppression of the fire among the forest land owners, except for a small assessment against the landowners within the Western Lane Forest Protection District which resulted in the collection of $25,000.
Moreover, the State of Oregon had made available to the Western Lane Forest Protective Association $163,186.60 out of the state’s Forest Emergency Fire Cost Fund. All the moneys in this fund had been granted to the State of Oregon by the defendant under section 2 of the Clarke-McNary Act, 43 Stat. 653 (1924).[7] These grants had amounted to some $4,467,795 in the fiscal years 1947 through 1952. The Western Lane Forest Protective Association had never returned any of the aforementioned amounts made available to it from this fund.
Under these facts as summarized above, we are asked to pass on plaintiffs’ legal and/or equitable entitlement to recover from the United States the net cost of suppressing this *317 fire. The plaintiffs, as stated earlier, predicate their claim upon the allegation that defendant’s forest practices in regard to the felling of snags and the disposal of slash, being less stringent than the fire-prevention policy of the State of Oregon, created an unusual fire hazard and caused the Vincent Creek fire to get out of hand.
The petition demands judgment against the United States, which could only be entered if a legal liability exists, and the briefs of plaintiffs urge a legal liability against the United States. While not mentioned in argument or in defendant’s brief, it is obvious that the statute of limitations, 28 U.S.C. § 2501,[8] would be a bar to any recovery by plaintiffs on legal grounds. In this case the fire occurred in 1951. The congressional reference bears the date June 3, 1960. The petition was filed November 7,1960. .Both the petition and the reference are more than six years after the alleged cause of action accrued and, consequently, this court has no jurisdiction to consider the case on legal grounds. Furthermore, plaintiffs in the petition allege that “since 1951 plaintiffs have demanded that defendant make payment to them * * *. However, said demand was formally and finally refused on September 25,1956, by letter from the Comptroller General of the United States * * Of course, demand could not be validly made before the accrual of a cause of action. Therefore, it seems clear that plaintiffs admit their cause of action accrued in 1951.[9] The fact that the Comptroller General refused payment in 1956 does not toll the statute of limitations. Tan v. United States, 122 Ct. Cl. 662, 664, 10 F. Supp. 552, 553 (1952); Moriarity, Inc. v. United States, 97 Ct. Cl. 338, 339, (1942); Cohen, Goldman & Co. v. United States, 77 Ct. Cl. 713, 730, cert. denied, 290 U.S. 681 (1933); Withers v. United States, 69 Ct. Cl. 584 (1930); Howard University v. United States, 126 F. 2d 6, 9 (D.C. Cir. 1941); *318 American Eastman Corp v. United States, 133 F. Supp. 11, 15 (S.D.N.Y. 1955). No special statute requiring plaintiffs’ claim to be submitted to tbe Government Accounting Office is cited, and we know of none.
We will then proceed to examine tlie question of equitable entitlement — equity as used in its broad moral sense, rather than jural.[10]
Eespecting plaintiffs’ equitable claim against the United States — it seems manifestly clear that the United States has already paid for suppressing this fire. Under contract for the fiscal year commencing July 1, 1951, the defendant paid the Oregon Forest Fire Association the sum of $223,438.41 for fire protection. In consideration of this payment, plaintiffs were to suppress any fires originating on defendant’s lands. Plaintiffs now seek added consideration for the same services they were required to perform and for which they were compensated under the contractual arrangements with defendant, as aforesaid. Therefore, there can be no legal or equitable basis why plaintiffs should recover for services they have already been paid for.
Moreover, it seems clear that plaintiffs were under a legal and contractual duty to immediately and adequately suppress any fire originating on defendant’s lands. It is obvious that plaintiffs failed to adequately perform this duty. The Vincent Creek fire was spotted shortly after it originated on August 16,1951, at about 3:55 p.m., and was then reported to the Oregon Forest Fire Association. The Fire Association took action by only putting four boys and a crew chief to fight the fire. It was not until the evening of August 17 that the Oregon Forest Fire Association provided adequate resources and manpower to suppress the fire. However, by this time the fire had blown out of control. In this respect the evidence warrants the inference, as our commissioner has found, that if the Western Lane Forest Protective Association, upon learning of the Vincent Creek fire on August 16, 1951, had acted with reasonable promptness and decisiveness to take charge of the fire and to mobilize and organize the *319 available resources of manpower and equipment for firefighting purposes, the fire could have been brought under control by the end of August 16, before the fire had done any great amount of damage.[11]
Plaintiffs make much of the fact that defendant’s policy in connection with felling of snags and burning of slash did not meet the requirements of the Oregon law. However, respecting removal of snags, we agree with our commissioner that the evidence does not establish that the Bureau of Land Management failed to act with reasonable prudence in connection with the felling of unsalvageable snags within the area of the Smith River bum after 1938, or that the actions of the BLM in this respect failed to measure up to the standard of due care imposed by Oregon law on private landowners similarly situated.
As to the burning of slash, it was the general policy of the State of Oregon to require the prompt, hard, and intensive burning of slash on forest lands that were subject to the jurisdiction of the State, in order to eliminate slash completely as a potential fire hazard. The State endeavored to have this policy followed on all lands within the area of the Smith River burn where logging operations were conducted after 1938, as indicated in finding 14. The efforts of the State along this line were not effective, however, due to the refusal of the Bureau of Land Management to permit operators under its timber-sale contracts respecting O & C lands to conduct early, hard, and intensive slash-burning activities. The BLM opposed the early burning of slash, and also the hard and intensive burning of slash, on the grounds (1) that Such slash burnings were apt to get out of control and to generate forest fires, (2) they took nutrients out of the soil and made reforestation of an affected area difficult, and (3) they prompted erosion and stream siltation. It was the policy of the BLM not to permit the logging operators on O & C lands to burn any slash pursuant to State directives until at least four inches of rain had fallen after the beginning of the autumn rainy season. As a consequence, the burning of slash on O & C lands usually could not be under *320 taken until late October, or perhaps later, each year. Thus, as of August 16, 1951, there had been no burning of slash during 1951 on 0 & C lands within the area that is involved in the present litigation, and there were extensive accumulations of slash on such lands as a result of 1951 logging operations. Also, because it was the policy of the BLM not to permit the slash on O & 0 lands to be burned hard and intensively, the slash burnings on O & C lands in prior years had not been complete.[12]
We also agree with our commissioner’s factual conclusion that the evidence in the record does not establish that the policy and practice of the Bureau of Land Management with respect to the burning of slash on O & C lands, as already indicated, were imprudent or negligently created any greater risk of the spread of forest fire than would have been created by following on O & C lands the policy of the State of Oregon with respect to the early, hard, and intensive burning of slash.
Furthermore, the practice and policy of the Bureau of Land Management with respect to the burning of slash on O & C lands, as indicated above, had been firmly established and made known to the Oregon Forest Fire Association prior to the time when the fire-protection contract of July 1,1950 (see finding 9) was signed. In signing that contract, the BLM had no intention of departing from its previous practice 'and policy regarding the burning of slash on O & 0 lands, and the Oregon Forest Fire Association had no reasonable basis for assuming such an intention on the part of the BLM.
Federal law governing the subject forest lands provided that Federal policy might vary from the State’s policies hi the interest of the United States. Section 5 of the Act of August28,1937 (50 Stat. atp. 875) provided:
* * * That rules and regulations for the protection of the revested lands from fire shall conform with the requirements and practices of the State of Oregon insofar as the same are consistent with the interests of the United States. (Emphasis supplied)
*321 as here, where there is a variance, the Federal policy should not bow to local requirements.
Defendant vigorously argues that the E. K. Wood Lumber Company was on its land without permission or knowledge and, consequently, was a trespasser, thereby relieving the United States of responsibility for Wood’s negligent acts.
We are not certain as to defendant’s knowledge in respect to the above, but certainly the Wood Company did not have permission or authority to enter on defendant’s lands and engage in road construction. The E. K. Wood Lumber Company had applied to the Bureau of Land Management for permission to build a road but defendant had not yet granted such permission. There was a requirement that the E. K. Wood Lumber Company submit maps to the BLM for approval before construction could be started. This had not been done.
However, we think in the light of our earlier discussion, it makes no difference whether the E. K. Wood Lumber Company had permission to enter and build a road. As we stated earlier, the United States paid under its contract which placed a legal and contractual duty on plaintiffs to suppress the fire. We think plaintiffs negligently failed to carry out this duty. Additionally, money was made available under the Clarke-McNary Act. As we have said, this fact probably would not defeat a legal action. However, the money made available under that Act came from a congressional appropriation— it stemmed from the taxpayers. Any additional appropriation by Congress would come from the same source. Since we believe plaintiffs were paid under the contract and Congress was generous under the Clarke-McNary Act, anything in addition would be a mere gratuity.
For the reasons stated above, it is our conclusion that plaintiffs have neither a legal nor an equitable claim against the United States.
This opinion, together with the findings of fact, will be transmitted to Congress pursuant to S. Res. 327, 86th Congress, 2d session.
*322 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. On February 23, 1959, there was introduced in the Senate of the United States a bill (S. 1153,86th Cong.) “To compensate the State of Oregon for firefighting costs.” The bill provided as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Oregon Forest Fire Association and the State of Oregon, the sum of $181,101.89. The payment of such sum shall be in full satisfaction of their claim against the United States for reimbursement of its proportionate share of costs incurred in connection with emergency fire suppression of the Vincent Creek Forest fire m 1951 on lands administered by the Department of the Interior.
2. On June 2,1960, the Senate of the United States adopted the following resolution (S. lies. 327) :
Resolved, That the bill (S. 1153) entitled “A bill to compensate the State of Oregon for firefighting costs,” now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimants.
3. Copies of the bill and resolution referred to in findings 1 and 2, together with accompanying papers, were transmitted to the Court of Claims, and were received by the court on June 3,1960.
4. (a) A petition was filed with the Court of Claims by the Oregon Forest Fire Association and the State of Oregon, *323 as plaintiffs, on November J, 1960. In tbe petition, the plaintiffs asserted a claim, and asked for a judgment, against the United States in the amount of $184,101.89.
(b) An answer was filed by the United States, as defendant, on June 14, 1961.
(c) Pretrial proceedings were instituted by the trial commissioner on June 20, 1961. Such proceedings were concluded in October 1962.
(d) A 5-day trial was held in Portland, Oregon, during the period March 25-29, 1963. Subsequently, at the request of the plaintiffs, a further trial session was held in Washington, D.C., on November 4, 1963, for the reception of additional evidence. As the result of a stipulation made by the parties during the course of the trial, the amount of the plaintiffs’ claim against the defendant was reduced to $172,361.40.[1]
(e) On May 4,1964, the parties completed the preparation and submission of their respective requests for findings of fact and their respective objections to the findings requested by the opposing side.
5. (a) The Oregon Forest Fire Association is a nonprofit corporation that is composed of all the forest protective associations operating within the official fire protection districts of the State of Oregon.
(b) Acting under the authority of State law,[2] the State Forester of Oregon, for the purpose of promoting the prevention and suppression of forest fires, has designated various geographical areas in the State of Oregon to be official fire protection districts. Within each fire protection district, there has been organized under State law a forest protective association, in the form of a nonprofit corporation, to carry on activities for the protection of forest lands within the district from fire. Such activities relate to fire prevention, fire detection, and firefighting; and the district association maintains an organization, personnel, and physical facilities for these purposes. The membership of *324 each district association persons forest lands located within the exterior boundaries of the particular district.
(c) The Oregon Forest Fire Association coordinates the activities of the district associations; and it handles liaison between the district associations, on the one hand, and agencies of the State of Oregon, agencies of the United States, and private groups, on the other hand.
16. At all times material to this controversy, the Oregon Forest Fire Association (acting for itself and its constituent district associations) had a contract with the State of Oregon (acting through the State Forester) under which the district associations were obligated to provide, within their respective areas, fire protection for forest lands owned by the State of Oregon or by private persons who were not members of the various district associations.[3]
7. (a) The defendant is a very extensive owner of forest lands situated within the State of Oregon. Such lands are, in large part, revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant lands, which are commonly referred to as “O & C lands.” The O & C lands are generally intermingled with privately owned forest lands and grazing lands, so as to constitute a “checkerboard” pattern of land ownership.
(b) The O & C lands are administered by the Bureau of Land Management, an agency of the defendant, under the supervision of the Secretary of the Interior and subject to the provisions of the act of August 28, 1937 (50 Stat. 874), as amended and supplemented by the act of June 24, 1954 (68 Stat. 270).[4] The governing legislation provides (with exceptions that are not material to this litigation) that the O & C lands shall be managed for permanent forest production and the disposition of timber in conformity with the principle of sustained yield.
*325 (c) Section 5 of tbe act of August 28, 1937 (50 Stat. at p. 875), states as follows:
Sec. 5. Tbe Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect. The Secretary of the Interior is further authorized, in formulating forest-practice rules and regulations, to consult with me Oregon State Board of Forestry, representatives of timber owners and operators on or contiguous to said revested and recon-veyed lands, and other persons or agencies interested in the use of such lands.
In formulating regulations for the protection of such timberlands against fire, the Secretary is authorized, in his discretion, to consult and advise with Federal, State, and county agencies engaged in forest-fire-protection work, and to make agreements with such agencies for the cooperative administration of fire regulations therein; Provided, That rules and regulations for the protection of the revested lands from fire shall conform with the requirements and practices of the State of Oregon insofar as the same are consistent with the interests of the United States.[5] .
8. For a number of years prior to the 1951 Vincent Creek fire — and also at the time of that fire — the defendant (acting through the Bureau of Land Management) maintained contractual arrangements with the Oregon Forest Fire Association whereby the latter organization, on behalf of its constituent district associations, contracted to protect the O & C lands from fire. Pursuant to such contractual arrangements, the defendant paid to the Oregon Forest Fire Association, for the fire protection services of the district associations within their respective areas, the amounts indicated below with respect to the period that began on July 1,1947, and ended on June 30,1952:
Fiscal year: Amount
1948_ $131,840.27 .
1949_ 145, 679.54
1950_ 212,215.23
1951_ 212,435.11
1952_ 223,438.41
*326 9. (a) Prior to July 1, 1950, the fire protection contract between the defendant (represented by the Bureau of Land Management) and the Oregon Forest Fire Association relative to O & C lands provided (among other things) that the Oregon Forest Fire Association (through the district associations) :
* * * will protect the forest values on all of the foregoing classes of lands, * * * and will guard such lands from fire with the same degree of care as is given all other lands within the said protective units.
(b) The Bureau of Land Management was not satisfied with the contract provision quoted in paragraph (a) of this finding, principally because of the relationship of that provision to a policy of the district associations not to take charge of a forest fire in the absence of a request from the person owning or conducting operations on the land where the fire originated. The BLM thought that such a policy caused undue delay on the part of the district associations in taking-charge of and controlling forest fires, and that, because of this, the O & C lands within the districts were not receiving proper protection. The dissatisfaction of the BLM on this point was expressed to the Oregon Forest Fire Association while the parties were negotiating in 1950 over a new fire protection contract. The BLM insisted that the provision quoted in paragraph (a) of this finding be changed so that the district associations would be under a positive obligation to take prompt action in protecting O & C lands upon the discovery of a forest fire, irrespective of the nature of the district associations’ obligation respecting other lands in such a situation. As a result of the BLM’s insistence, the new fire protection contract relative to O & C lands that was entered into by the parties as of July 1,1950, used the following language in lieu of that quoted in paragraph (a) of this finding:
3. Irrespective of actions by others to suppress fires occurring on or threatening O & C lands covered by this agreement, within their respective protective areas the associations will supervise control action on any such fire as soon after its discovery as it is possible to get supervisory personnel to each such fire and will immediately *327 take sucli steps as are necessary to assure its suppression in the least possible time.
(c) The fire protection contract of July 1,1950, including the provision quoted in paragraph (b) of this finding, was in effect at the time of the 1951 Vincent Creek fire. (Other pertinent provisions of the July 1, 1950, contract are set out in finding 36.)
10. Approximately 28,000 acres of forest lands situated in Township 21 South, Range 9 West, in Township 21 South, Range 8 West, in Township 22 South, Range 9 West, and in Township 22 South, Range 8 West, of the Willamette meridian, Oregon, were involved in the 1951 Vincent Creek fire. Some of these lands were within the boundaries of the Western Lane Fire Protection District, others were within the boundaries of the Coos Fire Protection District, and others were within the boundaries of the Douglas Fire Protection District. The forest protective associations operating within those districts were and are, respectively, the Western Lane Forest Protective Association, the Coos Forest Protective Association, and the Douglas Forest Protective Association. These three district associations were and are members of the Oregon Forest Fire Association.
11. The 28,000-acre area affected by the 1951 Vincent Creek fire included approximately 11,000 acres of O & C lands.
12. The area affected by the 1951 Vincent Creek fire is mountainous country, being part of the Coast Range of Oregon. The area is traversed by numerous streams, such as Vincent Creek and Big Creek, which flow northerly into the Smith River, and Wells Creek, Weatherly Creek, and Paradise Creek, which flow southerly into the Umpqua River. These streams, during the geological ages, have cut through the mountains, creating a very rugged terrain that is steep and broken, with sharp ridges, abrupt slopes, and deep valleys or canyons between the ridges. The rough terrain has made firefighting in the area very difficult.
13. (a) Prior to 1938, the area that was to be affected later by the 1951 Vincent Creek fire was heavily forested. The forests consisted principally of Douglas firs, and many of *328 these were old-growth trees that were 100 years old or older and thus constituted merchantable timber.
(b) In 1938, this same area (except for the extreme southwestern portion) was burned over by a forest fire that is generally referred to as the Smith Fiver burn.[6] Although the old-growth trees within the area were not actually consumed by the fire dining the course of the Smith Fiver bum, most of them were so badly damaged by the 1938 fire that they later died and became snags (a term that is commonly used to describe dead trees). Younger trees were also killed by the fire and became snags. Many of the snags that resulted from the 1938 Smith Fiver burn were salvageable as merchantable timber, while other snags were not salvageable, because of extensive fire damage or lack of sufficient size.
,14. During the period between the 1938 Smith Fiver bum and the beginning of the 1951 Vincent Creek fire, substantial logging operations were conducted within the area with which the court is concerned in the present litigation. Such operations were mainly for the salvaging of merchantable snags, although there was some cutting of old-growth timber that survived the 1938 Smith Fiver burn. The logging operations were conducted both on O & C lands and on lands owned by persons other than the defendant. The logging operations on O & C lands were conducted pursuant to timber-sale contracts made by the Bureau of Land Management with private operators. The salvaging of the merchantable snags within the area had not been completed at the time when the 1951 Vincent Creek fire began. Consequently, many snags, both salvageable and unsalvageable, were standing within the area, both on O & C lands and on lands owned by persons other than the defendant, at the time when the 1951 Vincent Creek fire began.
15. Snags are very dangerous as fire hazards. When a forest fire reaches a snag, it ordinarily begins to burn the snag at the base, and the fire generally progresses up the snag to the top. In doing so, the fire creates a strong draft up the snag, and this draft will carry sparks and burning embers into the air. As the snag stands high in the air, the sparks and *329 burning embers from the snag are caught by the wind or air currents, and they are frequently carried to adjoining unburned areas, where they ignite the fuel among which they fall. A snag which has fallen to the ground because of age and deterioration, or which has been felled, is no longer such a dangerous fire hazard, although it represents a substantial addition to the fuel on the ground.
16. (a) The Bureau of Land Management was aware of the fire hazard created by the unsalvageable snags on the O & C lands within the area of the 1938 Smith Biver bum. As timber-sale contracts relative to the salvaging of mechantable snags on O & C lands within the area were made by the BLM after 1938, the purchasers were required, as part of the contractual arrangements, to fell not less than four unsalvageable snags per acre on the tracts of land affected by the various contracts. The BLM endeavored to have the timber purchasers operating on O & C lands concentrate their felling of un-salvageable snags on those standing on the ridges, because such snags represented a potentially greater fire hazard than the unsalvageable snags at lower elevations.
(b) The evidence does not establish that the Bureau of Land Management failed to act with reasonable prudence in connection with the felling of unsalvageable snags within the area of the Smith Biver burn after 1938, or that the actions of the BLM in this respect failed to measure up to the standard of due care imposed by Oregon law on private landowners similarly situated.
17. The logging operations referred to in finding 14 resulted in extensive accumulations of slash within the area that is involved in the present proceeding. Slash consists of the treetops, limbs, chunks, and pieces that remain and are left on the ground after merchantable snags or trees are felled and the usable logs are removed in a logging operation. The slash that was originally left on the ridges and the slopes tended to gravitate toward the bottoms of the valleys and canyons, where they comprised heavy concentrations of fuel.
18. Slash creates a fire hazard on forest lands. Fire spreads rapidly through such debris on the ground. Also, the presence of slash creates problems in connection with the *330 control of fire, since it is difficult to put fire lines through, the slash.
19. (a) It was the general policy of the State of Oregon to require the prompt, hard, and intensive burning of slash on forest lands that were subject to the jurisdiction of the State, in order to eliminate slash completely as a potential fire hazard. The State endeavored to have this policy followed on all lands within the area of the Smith Eiver burn where logging operations were conducted after 1938, as indicated in finding 14. The efforts of the State along this line were not effective, however, due to the refusal of the Bureau of Land Management to permit operators under its timber-sale contracts respecting O & C lands to conduct early, hard, and intensive slash-burning activities. The BLM opposed the early burning of slash, and also the hard and intensive burning of slash, on the grounds (1) that such slash-burnings were apt to get out of control and to generate forest fires, (2) they took nutrients out of the soil and made reforestation of an affected area difficult, and (3) they promoted erosion and stream siltation. It was the policy of the BLM not to permit the logging operators on O & C lands to burn any slash pursuant to State directives until at least 4 inches of rain had fallen after the beginning of the autumn rainy season. As a consequence, the burning of slash on O & C lands usually could not be undertaken until late October, or perhaps later, each year. Thus, as of August 16, 1951, there had been no burning of slash during 1951 on O & C lands within the area that is involved in the present litigation, and there were extensive accumulations of slash on such lands as a result of 1951 logging operations. Also, because it was the policy of the BLM not to permit the slash on O & C lands to be burned hard and intensively, the slash-burnings on O & C lands in prior years had not been complete.[7]
(b) The evidence in the record does not establish that the policy and practice of the Bureau of Land Management with respect to the burning of slash on O & C lands, as indicated in paragraph (a) of this finding, were imprudent or negligently created any greater risk of the spread of forest *331 fire than would have been created by following on O & C lands the policy of the State of Oregon with respect to the early, hard, and intensive burning of slash.
(c) The practice and policy of the Bureau of Land Management with respect to the burning of slash on O & C lands, as indicated in paragraph (a) of this finding, had been firmly established and made known to the Oregon Forest Fire Association prior to the time when the fire-protection contract of July 1,1950 (see finding 9) was signed. In signing that contract, the BLM had no intention of departing from its previous practice and policy regarding the burning of slash on O & C lands; and the Oregon Forest Fire Association had no reasonable basis for assuming such an intention on the part of the BLM.
20. As of August 16, 1951, in addition to the accumulations of slash on O & C lands referred to in finding 19(a), there were also extensive accumulations of slash on intermingled forest lands owned by persons other than the defendant. The policy of the State of Oregon with respect to the early, hard, and intensive burning of slash could not be enforced with complete effectiveness on lands owned by persons other than the defendant, since such lands were intermingled with O & C lands and the defendant would not permit the State’s policy to be effectuated on O & C lands. The slash accumulations on O & C lands within the area affected a total of approximately 2,800 acres, and the slash accumulations on intermingled lands owned by persons other than the defendant affected approximately 7,200 acres. Much of the slash was heavily concentrated in the bottoms of the valleys and canyons. In addition, there were many standing snags and many fallen snags within the area, both on O & C lands and on lands owned by persons other than the defendant. Because of the large amount of fuel, the concentration of the fuel in the bottoms of the valleys and canyons, and the inclusion among the fuel of a great deal of slash and many standing snags, the area was very susceptible to the spread of forest fire. The situation was exceptionally hazardous in this respect because the fuel was very dry as of August 16,1951.
*332 21. (a) On August 16, 1951, the E. K. Wood Lumber Company (acting through a contractor) was engaged in the construction of a logging road through a portion of Section 27, Township 21 South, Eange 9 West, Willamette meridian, Oregon. That section constituted part of the O & C lands administered by the Bureau of Land Management. It was within the boundaries of the Western Lane Fire Protection District. The E. K. Wood Lumber Company had applied to the Bureau of Land Management for permission to build a road through Section 27, but the BLM had not granted such permission as of August 16,1951, and the BLM was not aware that road construction work was in progress.
(b) On August 16,1951, the contractor for the E. K. Wood Lumber Company, while working on Section 27 without authorization from the Bureau of Land Management, negligently ignited a forest fire at a point on the section near Vincent Creek. This fire has generally been referred to since that time as the Vincent Creek fire.
22. (a) A lookout maintained by the Western Lane Forest Protective Association spotted the Vincent Creek fire very soon after it originated, and promptly made a report by radio at 3:55 p.m. on August 16,1951, to the office of the District Fire Warden at the headquarters of the district association in Veneta, Oregon, which was about 60 miles from the Vincent Creek fire.
(b) Immediately upon receiving the report mentioned in paragraph (a) of this finding, the District Fire Warden of the Western Lane Forest Protective Association, Eay Oglesby, got in touch with Jack Wood, the district association’s fire warden at the Vincent Creek guard station. Mr. Oglesby instructed Jack Wood to take his crew of four teenage boys and go to the scene of the fire, check it, and report back to Mr. Oglesby.
(c) While awaiting a report from Jack Wood, Eay Oglesby alerted the main fire-suppression crew at the headquarters of the district association, consisting of 10 or 12 men, and told them to eat dinner early, because it appeared that they would probably be dispatched to the Vincent Creek fire. However, this crew was not sent to the fire on August 16.
*333 (d) A small group, composed of persons employed by tlie Longbell Lumber Company and by tlie Whitlow Lumber Company, logging operators within the area, had learned of the Vincent Creek fire over the radio, and reached the scene of the fire at about 4:10 p.m. on August 16, 1951. The fire then covered approximately 4 or 5 acres on the north side of the new road construction in Section 27. It was burning only on the ground in grass, leaves, and bushes. No snags or trees had been ignited at the time when this group reached the fire. However, the fire soon “jumped” from the north side of the road to the other side of the road and ignited a snag. The fire burned in the snag for about 10 minutes, and then spread up a hill, burning fuel on the ground. The rate of spread was not very rapid at this time, as the wind was light. -
(e) Jack Wood and his crew (see paragraph (b) of this finding) reached the Vincent Creek fire at about 4:30 p.m. on August 16,1951. Mr. Wood walked around the fire in order to ascertain its scope and direction; The situation at the time was approximately the same as that described in paragraph (d) of this finding, after the fire began to burn on both sides of the new road construction. The fire was spreading, but the rate of spread was slow. Mr. Wood, after completing his examination, made a report at 4:45 p.m. by radio to the District Fire Warden, indicating that the fire was then burning on both sides of the new road construction in Section 27. Mr. Wood requested authority to hire a caterpillar tractor (commonly called a “cat”) and men to assist him in controlling the fire, and the District Fire Warden told him to take whatever action seemed to be required.
(f) Jack Wood and his crew observed near the Vincent Creek fire a “cat” that belonged to the roadbuilding contractor for the E. K. Wood Lumber Company. Mr. Wood endeavored to start the tractor, intending to use it for firefighting purposes, but the tractor could not be started because of the lack of oil and filters. Mr. Wood and his crew then attempted to control the fire by building, with hand tools, a fire trail on the uphill side of the fire. Also, Mr. Wood arranged with the Whitlow Lumber Company for the latter to furnish a “cat” and personnel to assist in controlling the fire.
*334 (g) Kay Oglesby, the District Fire Warden of the Western Lane Forest Protective Association, reached the scene of the Vincent Creek fire at about T p.m. on August 16,1951. At that time, the only organized effort to fight the fire was being made by Jack Wood and his crew of four boys. However, Mr. Oglesby encountered several people who were standing near the fire, observing it. One of the observers was the man in charge of logging activities for the E. K. Wood Lumber Company. The Wood Company’s representative informed Mr. Oglesby that he was leaving to round up some men in order to fight the fire. Mr. Oglesby spent the remainder of the evening of August 16 at the scene of the fire, observing it and waiting for an organized crew of firefighters from the E. K. Wood Lumber Company to arrive. Mr. Oglesby believed that it was the responsibility of the Wood Company to control the fire, and that this company should provide the manpower and other resources needed for the purpose. However, no firefighting crew from the Wood Company arrived at the scene of the fire on August 16.
(h) Personnel of the Bureau of Land Management reached the scene of the Vincent Creek fire at about 7:30 p.m. on August 16, 1951. At that time, the fire had spread to the point where it covered approximately 60 acres.
(i) By about 8:30 p.m. on August 16, 1951, a “cat” and a small crew of men[8] that Jack Wood had arranged to obtain from the Whitlow Lumber Company were at the scene of the Vincent Creek fire and were working in an attempt to “pinch off” the fire. Also, the “cat” that was owned by the roadbuilding contractor for the E. K. Wood Lumber Company had been supplied with oil and filters, had been started, and was being used in firefighting activities by two of the roadbuilder’s men.
(j) Jack Wood and his crew of four boys left the Vincent Creek fire at about 9 p.m. on August 16, 1951. There were then two small crews using two “cats” to fight the fire, as indicated in paragraph (i) of this finding. The evidence is not clear as to how late on the night of August 16 these two crews worked.
*335 (k) By midnight on August 16, 1951, the Vincent Creek fire had spread to the point where it covered about 160 acres, mostly within the boundaries of the section where the fire originated.
23. (a) A special “hot-shot” crew of firefighters maintained by the State of Oregon, consisting of a foreman and 24 young men, reached the scene of the Vincent Creek fire at about 4 a.m. on August 17, 1951. They were specialists in building fire trails with hand tools. On arriving at the fire, they began to cut a trail around the east side of the fire. However, this effort was not sufficient to contain the fire, which broke through their line at a number of places. This crew continued working at the fire until about 9 a.m. on the 17th, when they made camp about 2 miles from the fire. Thereafter, they remained in the vicinity and were engaged in firefighting work for approximately 14 days.
(b) A firefighting crew from the E. K. Wood Lumber Company arrived at the scene of the Vincent Creek fire by 9 a.m. on August 17, 1951, and began fighting the fire.
(c) The Longbell Lumber Company furnished some personnel and equipment on August 17,1951, for the purpose of fighting the Vincent Creek fire.
(d) The firefighting activities at the Vincent Creek fire throughout the morning and afternoon of August 17, 1951, were comparatively small-scale in extent, with a few crews fighting the fire on a unit-by-unit basis and without any centralized supervision or direction. No effort was made by anyone at the time to organize a large-scale effort to control the fire. B.ay Oglesby, the District Fire Warden of the Western Lane Forest Protective Association, still regarded the E. K. Wood Lumber Company as being responsible for the control of the fire.
(e) The Vincent Creek fire continued to spread through the morning and afternoon of August 17, 1951. About the middle of that afternoon, the fire had increased to such a volume and had generated so much heat that it developed its own drafts and suddenly “blew up.” The fire came out of the Vincent Creek area with great velocity and began to spread very rapidly. The heat waves picked up burning embers, especially from the standing snags, and carried them *336 for great distances into previously unaffected areas, where new fires were started. Some of the burning embers were carried across the Umpqua River, and fires were started on the other side of that river. The fire was then completely out of control. It quickly spread from the district of the Western Lane Forest Protective Association into the districts of the Coos Forest Protective Association and the Douglas Forest Protective Association.
(24. (a) Following the development referred to in finding 23 (e), a meeting was held in the vicinity of the Vincent Creek fire on the evening of August 17, 1951. This meeting was attended by representatives of the Western Lane Forest Protective Association, of the Coos Forest Protective Association, of the Douglas Forest Protective Association, of logging companies operating in the area, and of the Bureau of Land Management, as well as other persons. It was agreed at the meeting that the Western Lane Forest Protective Association should take over the task of trying to control the fire and that Ray Oglesby, the District Fire Warden of that association, should take charge of the firefighting activities in the capacity of fire boss. Mr. Oglesby expressed the opinion that there should be a formal predicate for this action in the form of a request for assistance from the E. K. Wood Lumber Company. Such a written request was signed by a representative of the Wood Company, and Mr. Oglesby thereupon officially assumed the role of fire boss and took over the fire-supervision job.
(b) Under the direction of Ray Oglesby as fire boss, steps were promptly taken to establish a fire headquarters at the Wells Creek guard station, to recruit firefighting personnel, to procure firefighting equipment, to obtain camping equipment for the firefighting personnel, to adopt an organizational plan under which the fire line was divided into divisions and the divisions were divided into sectors, to organize firefighting crews for assignment to the various sectors, to designate a fire-camp boss and an equipment boss, to designate daytime and nighttime bosses for the respective divisions and sectors, to designate foremen for the firefighting crews, to establish a scouting system for reconnaissance purposes (involving the use, among other things, of an aircraft *337 and pilot provided by the State of Oregon), and to establish a system of communications by radio.
(c) Extensive resources of manpower and equipment were available within the general area, and no particular difficulty was encountered in recruiting personnel or in obtaining equipment for use in fighting the Vincent Creek fire. A firefighting force of approximately 1,500 men was recruited.
25. After Nay Oglesby, the District Fire Warden of the Western Lane Forest Protective Association, began functioning as fire boss on the evening of August 17, 1951, the firefighting activities at the Vincent Creek fire were supervised and conducted with reasonable efficiency. However, the fire had grown to such proportions by the evening of August 17 that, despite the subsequent well-organized and well-conducted firefighting activities, the fire could not be brought under control, and continued to spread, until August 28, by which time the fire had covered approximately 28,000 acres, including approximately 11,000 acres of O & C lands. The heavy concentrations of slash in the valleys and canyons, the large number of standing snags, and the dryness of the fuel contributed greatly to the spread of the fire.
26. By August 28,1951, the Vincent Creek fire reached the outermost limits of its spread. However, the fire continued to burn inside its outer perimeter for some time, and mopping-up operations by firefighting personnel continued into the month of September 1951.
27. The evidence warrants the inference that if the Western Lane Forest Protective Association, upon learning of the Vincent Creek fire on August 16,1951, had acted with reasonable promptness and decisiveness to take charge of the fire and to mobilize and organize the available resources of manpower and equipment for firefighting purposes, the fire could have been brought under control by the end of August 16, and before the fire had done any great amount of damage.[9]
28. The Western Lane Forest Protective Association initially defrayed the costs (wages, subsistence, equipment rental, etc.) of fighting the 1951 Vincent Creek fire. Such *338 costs totaled $457,361.40. However, there was an understanding between the Western Lane Forest Protective Association, the Coos Forest Protective Association, and the Douglas Forest Protective Association whereby the Vincent Creek fire costs were to be spread among the three district associations on the following basis:

Percent

Western Lane FPA_ 38
Coos FPA_ 31
Douglas FPA__— 31
29. (a) The State of Oregon made available to the Western Lane Forest Protective Association, out of the State’s Forest Emergency Fire Cost Fund, the sum of $163,186.60 to aid in defraying the Vincent Creek fire costs.
(b) No part of the $163,186.60 referred to in paragraph (a) of this finding has subsequently been returned to the State’s Forest Emergency Fire Cost Fund.
(c) All moneys contained in the State’s Forest Emergency Fire Cost Fund in 1951 were moneys which had been granted to the State of Oregon by the defendant under Section 2 of the Clarke-McNary Act (43 Stat. 653 (1924)). The following payments were made by the defendant to the State of Oregon pursuant to Section 2 of the Clarke-McNary Act for the years indicated:
Fiscal year: ¿mount
1947_$764,998
1948_ 863,817
1949_'_ 761, 469
1950_ 708,166
1951_ 708,166
1952_ 661,079
30. (a) In 1951, the State of Oregon filed suit in the Circuit Court of the State of Oregon for the County of Douglas against the E. K. Wood Lumber Company (No. 15103) for the recovery of $469,101.89, this being the amount that was alleged to have been expended in the suppression of the 1951 Vincent Creek fire.
(b) The litigation mentioned in paragraph (a) of this finding was settled in September 1954 by the parties on the basis of a compromise agreement under which the E. K. Wood Lumber Company paid the State of Oregon the sum of $235,000.
*339 31. On July 15,1955, the liability of the Longbell Lumber Company to the State of Oregon for fire-suppression costs in connection with the 1951 Vincent Creek fire was compromised through the payment by Longbell of $50,000 to the State of Oregon.
32. The sum of $172,361.40 which the plaintiffs seek to recover from the defendant in the present action represents the difference between the total cost ($457,361.40) of suppressing the 1951 Vincent Creek fire and the total amount ($285,000) which the State of Oregon recovered from the E. K. Wood Lumber Company and the Longbell Lumber Company.
33. The evidence in the record does not provide an adequate basis for a claim, legal or equitable, by the plaintiffs against the defendant.
34. On February 29,1952, after the Vincent Creek fire, the defendant canceled the fire protection contract of July 1, 1950, between the defendant and the Oregon Forest Fire Association. The defendant’s letter of cancellation addressed to the Oregon Forest Fire Association started as follows:
Reference is made to contract I-1L-907 between the Bureau of Land Management and the Oregon Forest Fire Association. We have discussed with you previously ways and means of improving fire protection on the lands under our administration.
As discussed with you, our major reason for changing the contract with OFFA in 1950 was our experience that the OFFA had no real control over its member associations. Consequently, we felt it necessary to negotiate with the individual associations for fire protection. This has not proved satisfactory because the local wardens are under control of the State Forester during the fire season rather than under the direction of our contractor, the local association.
You will recall that we discussed this problem with the OFFA directors and also with you, Mr. Hersey and Mr. Morse in a separate session. By letter of January 28,1952, we explored this and other questions further with you. We covered similar questions with the State Forester. From replies received it appears that
we can make arrangements with the State which will more nearly meet our needs for fire protection on the O & C lands. In fact we cannot see our way clear to continue a contract which does not clearly establish *340 contractual relations with the agency actually responsible for firefighting during the critical fire season.
This letter is, therefore, notification to you that in accordance with section 9 of the above contract quoted below, we intend to terminate our contract with the OFFA acting on its own behalf and as agent for the individual associations and state districts in western Oregon.
“It is understood and agreed that BLM and OFFA shall each have the right during the months of November to February, inclusive, of each fiscal year, to terminate this agreement by giving to the other party not less than thirty days notice m writing in advance of selected termination date. Such termination shall not relieve BLM from payment of the pro rata amount due to OFFA pursuant to the terms of this agreement to and including the effective date of such termination.”
In accordance with the above provisions termination of contract I-1L-907 will be effective at midnight June 30,1952.
Payment for the last half of fiscal year 1952 will be made to the OFFA under the terms of item 7 of the contract.
We are now negotiating with the Oregon State Board of Forestry for a fire protection contract. From our discussions with the State Forester it would appear that no action will be taken by him which will impair the financial status of the associations. Undoubtedly he will be making specific arrangements with the OFFA and the member associations for fire protection of the BLM lands in the next few weeks.
We are confident that the State Forester will be able to work out satisfactory arrangements; however, we will be glad to cooperate with the OFFA in ironing out any difficulties which may arise from the change in our contracting agent.
We have appreciated our past associations and hope that we may continue our efforts to reach our common objective of better fire protection for the forest resources.
35. Costs incurred by an Oregon fire protection district in one fiscal year are generally spread the next fiscal year by means of assessments against the forest lands owned by members of the district forest protective association. Owners of forest lands within a district who are not members of the district associaton are assessed comparable amounts by the State of Oregon for fire-protection purposes. However, the *341 State of Oregon, the Western Lane Fire Protection District, the Coos Fire Protection District, and the Douglas Fire Protection District have not taken any action to spread among the owners of forest lands within the three districts the costs incurred in suppressing the 1951 Vincent Creek fire (except for an assessment of 10 cents per acre on the landowners within the Western Lane Fire Protection District, which resulted in the collection of $25,000).
36. The fire-protection contract of July 1, 1950, between the defendant (represented by the Bureau of Land Management) and the Oregon Forest Fire Association (acting for itself and for its constituent district associations, including the Western Lane Forest Protective Association, the Coos Forest Protective Association, and the Douglas Forest Protective Association) relative to the protection of O & C lands from fire provided in part as follows:
2. The OFFA [Oregon Forest Fire Association] shall promptly notify the O & C District Forester concerned of the start and location of any fires on or threatening O & C lands. The OFFA shall protect from fire the forest, watershed, and other values on O & C lands currently covered by this agreement.
3. Irrespective of actions by others to suppress fires occurring on or threatening O & C lands covered by this agreement, within their respective protective areas the associations will supervise control action on any such fire as soon after its discovery as it is possible to get supervisory personnel to each such fire and will immediately take such steps as are necessary to assure its suppression in the least possible time.
& ífc H: #
7. Prior to July 1 of each year, the BLM shall prepare a statement showing the acreage of O & C lands to be protected by each association with which the OFFA contracts. BLM agrees to pay OFFA for such protection an amount per acre, to be effective for the ensuing fiscal year, which shall be equal to the weighted average cost of protection of forest lands during the preceding calendar year as shown by the official certified reporte of the associations furnishing protection hereunder and as shown by the reports for state districts as certified by the Oregon State Forester. OFFA shall obtain said reports and furnish them to BLM. For providing protection hereunder, the BLM intends that OFFA shall be *342 compensated in tbe full amount computed in the manner prescribed above, provided, however, it is agreed that BLM shall not be obligated to pay a greater amount in any fiscal year for such protection than is designated by Congress for the protection of the O & C lands from fire.
BLM shall make payment to OFFA as follows: For the period July 1 to December 31 of each year, a payment of approximately 60 percent of the full amount due for the fiscal year shall be paid as soon after December 31 as practicable. For the period commencing January 1 to and including June 30 of each fiscal year the balance of the amount due for such fiscal year shall be paid as soon as practicable after June 30.
•i» H* $
9. It is understood and agreed that BLM and OFFA shall each have the right during the months of November to February inclusive, of each fiscal year, to terminate this agreement by giving to the other party not less than thirty days’ notice in writing in advance oi selected termination date. Such termination shall not relieve BLM from payment of the pro rata amount due to OFFA pursuant to the terms of this agreement to and including the effective date of such termination.
‡ ‡ v
12. The OFFA agrees to require each association or district which may engage in the protection of any BLM lands to agree to all of the terms, covenants and conditions hereof.
The effective date of this agreement is July 1, 1950. The agreement will remain in force until terminated as above provided.
37. The Western Lane Forest Protective Association and the Oregon Forest Fire Association signed an agreement effective July 1,1950, providing as follows:
First: Both parties agree to the attached Bureau of Land Management-Oregon Forest Fire Association contract, aiid the Western Lane Forest Protective Association hereby agrees to carry out all obligations of the Oregon Forest Fire Association as pertain to protection of the lands involved within its protection boundaries.
Second: The Western Lane Forest Protective Association will furnish the Oregon Forest Fire Association with the information necessary to make a detailed esti *343 mate of the Association’s cost per acre for the current calendar year.
Third: The Oregon Forest Fire Association will summarize such costs for all Associations, including in each the amounts actually spent by the State Forester in the several fire patrol districts, and with this as a basis determine the total amount of the next subsequent contract between the Bureau of Land Management and the Oregon Forest Fire Association.
The Oregon Forest Fire Association will present such claim to the Bureau of Land Management and make every effort to have the amount in full included in the budget for the Bureau of Land Management.
The Oregon Forest Fire Association will distribute all moneys under this contract, except that a fee of two percent (2%) will be charged non-member Associations. Funds will be disbursed in total within five (5) days after their receipt.
Distribution of the amount received from the Bureau of Land Management by the Oregon Forest Fire Association will be made to the various Associations on the basis of Oregon Forest Fire Association’s claim to the Bureau of Land Management, and each Association will get its correct proportionate part of the funds received.
This Agreement will take effect July 1, 1950, and remain in force until terminated as provided in Section 9 of the contract with the Bureau of Land Management, attached thereto.
38. At the times material to this litigation, some pertinent provisions of the Oregon Forest Laws were as follows:
n. FIRE WARDENS
$ $ $ $ *
107-205. Duties and powers * * *.
All wardens appointed under this act shall, under instructions from the forester as to their exercise of state authority, take proper steps for the prevention and ex-tinguishment of fires within the localities in which they exercise their functions, assist in apprehending and convicting offenders against the fire laws, control the use of fire for clearing land in the closed season, as provided by sections 107-209 and 107-211 and make such reports of their work and conditions within their localities as may be requested by the forester. They shall have the *344 power of peace officers to make arrests for violation of forest laws. They shall have the power to enter upon the lands of any person or owner in the discharge of their duties; provided, that in so entering they shall exercise due care to avoid doing damage. * * *
107-206. * * * Kefusal to assist Avarden * * *.
* * * Any able-bodied man refusing, without reasonable excuse, to render assistance in suppressing a grass, brush or forest fire when called upon by a regular appointed state fire warden, shall be guilty of a misdemean- or and shall be punished by a fine of not less than ten dollars ($10) nor more than one hundred dollars ($100); proAfided, that any such person so called upon for assistance shall be paid the going rate of wages for such work,
E. FOREST LAND EIRE PROTECTION
107-207. Official fire districts and deputies therein.
For the prevention and suppression of forest fires the state forester shall, under authority of the state board of forestry, and with the advice of property owners or agents or counties desiring to cooperate in forest protection, make and enforce such rules and regulations as are ■necessary for the proper administration and enforcement of laws pertaining to fire protection, and designate suitable areas to be official fire districts. He shall appoint for each district one or more district fire wardens to be paid from the general fund appropriation or such other funds as may be available for lire protection within each district and to serve until their appointments are revoked by the state forester for good cause shown. Any other fire warden appointed by the state forester to serve in the district, except those designated as inspectors, shall be subject to the direction of the proper district fire Avarden.
ÍJÍ «}» íj» «Í»
107-212. Uncontrolled fire declared nuisance * * *.
Any fire on any forest land in the state of Oregon burning uncontrolled and/or without proper action being taken to prevent its spread, notwithstanding the origin of such fire, hereby is declared a public nuisance by reason of its menace to life and property. The owner, operator and person in possession of land, on which a fire exists, or from which it may have spread, or either or any or them, notwithstanding the origin or subsequent spread thereof on his own or other land, hereby is *345 required to make every reasonable effort to control and extinguish such fire immediately its existence comes to his knowledge, without awaiting instructions from the forester or a warden, or ranger; and if such owner or person in possession shall refuse, neglect or fail so to do, the forester, or any forest protective agency under contract with the state board of forestry for the protection of forest land against fire, and within whose protection area the fire exists, shall summarily abate the nuisance thus constituted by controlling or extinguishing the fire, and the cost thereof shall be recovered from such owner or person in possession when necessary by action for debt, prosecuted in the name of the state of Oregon; and such cost shall constitute a lien upon the property of said owner. * * *
‡ ‡ ‡ $
107-222. Slashings — Definition — Annual burning * * *.
Any person, by which is meant every individual, partnership, corporation, or other association, engaged in harvesting of forest products, or permitting harvesting of forest products upon any lands in this state, thereby creating a fire hazard, shall, unless relieved by the state forester, as herein provided, each year remove such hazard by burning the annual slashing, by which is meant the tops and inflammable refuse left after harvesting forest products that may carry fire or cause it to be spread, at. such time and in such manner and with such provision of help as shall afford all necessary precaution against the spread of fire to other property. Any and all such burning during the closed season shall be done in accordance with the provisions of section 107-209. Before any such burning during the closed season, such person shall first cut down all dead trees and snags over twenty-five (25) feet in height for a distance of not less than two hundred and fifty (250) feet inward from any exterior boundaries of such slashings which are adjacent to standing timber or reproducing areas; provided, that where upon the finding of the forester that such burning will create additional fire hazard, or will do excessive damage to reproduction or residual stands, or will retard restocking, or where by reason of these or other similar causes the operator or landowner in writing requests to be relieved from the requirements of burning, the said forester may relieve by written authorization such person from the above requirements with respect to part or all of the operation area if the said person *346 sba.11 provide additional protection adequate to offset the hazard created by the slashing until such time as the forester shall find, that such hazard has been satisfactorily reduced through deterioration or other natural means. Upon the finding of the forester that the hazard created by the slashing has been removed by burning, or that the hazard has been satisfactorily reduced through •deterioration or other natural means, it shall be the duty of the forester to issue to the operator or the landowner a release from any and all obligations imposed by the provisions of this act.
* % % * *

 The reference of this case and proceedings thereon were prior to the Supreme Court decision in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). Therefore, this opinion is filed without reference to the Supreme Court’s opinions above, and we reject defendant’s assertion of lack of jurisdiction.

 The term “snags” Is commonly used to describe dead trees. Standing snags are a very dangerous fire hazard, while a snag which has fallen to the ground is no longer a hazard. See finding 15.

 The term “slash” is used to describe the treetops, limbs, chunks, and pieces that remain and are left on the ground after merchantable snags or trees are felled and the usable logs are removed in logging operations.

 The private owners of forest lands who were not members of the district associations participated in the financing of the fire protection program, since the State of Oregon made assessments against their lands.

 The Act of June 24, 1954, was enacted after the 1951 Vincent Creek fire occurred, hut it did not make any change that affects the present litigation. The provisions of law governing the O & C lands are now codified as 43 U.S.C. §§ 1181a—1181j (1958 Ed.).

 This section is now codified as 48 U.S.C. § 1181e (1958 Ed.).

 Plaintiffs strenuously object to this finding of fact, contending that the Clarke-McNary Act has nothing to do with liability in this case. Concededly, the payments under this Act have no bearing on plaintiffs’ legal right to recover. However, the use of these funds is germane to the issue of plaintiffs’ equitable entitlement as that term is used in our congressional reference jurisdiction.

 28 U.S.C. § 2501 provides, in part, that:
“Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.”

 This is fortified by the fact that in 1951 the State of Oregon filed suit against the E. K. Wood Lumber Company, which obviously was the date when plaintiffs’ cause of action first accrued, for this reason — if E. K. Wood Lumber Company was liable, this date would be the accrual of liability, if any, of the United States.

 Even though this portion of the opinion is directed to plaintiffs’ lack of equitable grounds for recovery, the same reasons are in most respects equally applicable for a denial of legal recovery.

 As indicated in finding 22 (k), the fire had covered only about 160 acres at midnight on August 16, 1951.

 The evidence is not clear regarding the extent of the pre-1951 slash on O & C lands as of August 16, 1951.

 At the time of the trial, the name of the Oregon Forest Fire Association had been changed to “Oregon Forest Protection Association.” It is still the same organization.

 Some pertinent provisions of Oregon law are set out in finding 38.

 The private owners of forest lands who were not members of the district associations participated in the financing of the fire protection program, since the State of Oregon made assessments against their lands.

 The act of June 24, 1954, was enacted after the 1951 Vincent Creelr fire occurred, but it did not make any change that affects the present litigation. The provisions of law governing the O & C lands are now codified as 43 U.S.C. §§ 1181a-1181j (1958).

 TMs section is now codified as 43 U.S.C. § 1181e (1058)).

 The 1938 fire Is sometimes referred' to as the Big Creek fire.

 The evidence Is not clear regarding the extent of the pre-1951 slash on O & C lands as of August 16,1951.

 The evidence is not clear as to -whether this crew consisted of two men or four men.

 As Indicated In finding 22 (k), the fire had covered only about 160 acres at midnight on August 16, 1951.